CLERK'S OFFICE U.S. DISTRICT COURT
AT HARRISONBURG, VA
FILED

September 13, 2024

LAURA A. AUSTIN, CLERK
BY: s/ K. Dotson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| DEBRA A., | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-00304 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:  Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Debra A. asks this Court to review the Commissioner of Social Security's final

decision denying her applications for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 401–434, and supplemental security income ("SSI") under

Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f, after a prior federal court

remand, 42 U.S.C. § 405(g) (sentence four). The case is before me by referral under 28 U.S.C. §

636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 7, the parties' briefs,

ECF Nos. 12, 16, and the applicable law, I find that substantial evidence does not support the

Commissioner's final decision that Debra was not disabled before July 10, 2019, *see* R. 938–97.

Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and

remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" under the Social Security Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

This case involves Debra's second of three sets of claims for disability benefits. *See* R. 1089, 1101–02. Debra first filed for DIB and SSI in November 2013, alleging that she had been disabled since September 30, 2010, because of numerous medical conditions, including bilateral total hip arthroplasty with revision on the left, sacroiliac ("SI") joint dysfunction, sacral facture, a right-ankle fracture, cervical and lumbar degenerative disc disease, migraines, depression, and anxiety. R. 93, 95–96. In May 2015, Debra appeared with counsel and testified at a hearing before ALJ David Lewandowski. R. 1317–51. Vocational expert ("VE") Barry Hensley, Ed.D., also testified at this hearing. R. 1353–56.

ALJ Lewandowski issued an unfavorable decision on July 25, 2015. *See* R. 93–106. He found that Debra's severe physical impairments limited her to a reduced range of "sedentary work"[2] and that her non-severe mental impairments did not limit her ability to sustain "skilled

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final written decision.

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools," 20 C.F.R. §§ 404.1567(a), 416.967(a), plus sitting for six hours and standing/walking for two hours in an eight-hour workday, *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002) (citing SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996)). "Under the regulations, 'sedentary work' represents a significantly restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations." SSR 96-9p, 1996 WL 374185, at *3.

work[3] tasks. R. 95–98, 104–05. Relying on Dr. Hensley's testimony, he concluded that Debra could still perform her past relevant work as a "bank branch manager" (DOT No. 189.117-034), R. 105, as well as two other skilled sedentary occupations (loan officer, loan interviewer) in the national economy, R. 105–06 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.15, 201.22). ALJ Lewandowski's decision is the final decision of the Commissioner that Debra was "not disabled" on or before July 25, 2015. *See* R. 84–85, 1089; 20 C.F.R. §§ 404.955, 416.1455.

\*

Debra filed these concurrent DIB/SSI claims in the fall of 2015. *See* R. 276–78. She alleged that she had been disabled since July 26, 2015, *id.*, because of hip pain status-post bilateral hip replacements, an unsteady gait, lower back pain, avascular necrosis with SI joint disorder, migraines, depression, anxiety, and panic attacks, R. 113, 126. Debra was 54 years old in July 2015, R. 112, 125, making her a "person closely approaching advanced age" under the regulations on her alleged onset date, 20 C.F.R. §§ 404.1563(d), 416.963(d). Debra turned 55 on January 6, 2016. *See* R. 112, 125. From that point forward, she was a "person of advanced age" under the regulations. *See* R. 112, 125, 988; 20 C.F.R. §§ 404.1563(e), 416.963(e). Virginia Disability Determination Services ("DDS") denied her concurrent claims initially in May 2016, R. 138–39, and upon reconsideration in August 2016, R. 166–67.

On June 28, 2017, Debra appeared with counsel and testified at a hearing before ALJ Lewandowski. R. 1360, 1368–95. Debra described specific ways in which her chronic pain and other symptoms impacted her day-to-day functioning—including how "difficulty" remembering

---

[3] The regulations classify occupations as "unskilled, semi-skilled, [or] skilled" work. *See* 20 C.F.R. §§ 404.1568(a)–(c), 416.968(a)–(c). "Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced." *Id.* §§ 404.1568(c), 416.968(c). These "jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity." *Id.*

things, focusing, staying on task, handling stress, and rectifying work-related "issues" would not allow her to return to her "very complex" past work in the banking industry. *See* R. 1370–72 (past work); R. 1376–78, 1380–83, 1385–86, 1389, 1393–95 (alleged functional limitations and activities of daily living). These problems had been present since late July 2015. R. 1376–78. VE Asheley Wells also testified at the June 2017 hearing. R. 1396–1402.

ALJ Lewandowski issued an unfavorable decision on December 5, 2017. *See* R. 11–41. As before, he found that Debra's severe physical impairments limited her to a reduced range of sedentary work[4] and that her non-severe mental impairments did not limit her ability to sustain skilled work tasks. *See* R. 15–19, 33–34, 36–37. Relying on Dr. Hensley's testimony from the May 2015 hearing on Debra's prior claims, ALJ Lewandowski concluded that Debra was "not disabled" between July 26, 2015, and December 5, 2017, because she could still perform her past relevant work as a bank vice president, R. 37–38, as well as the two other skilled occupations (loan officer, loan interviewer) that he identified in his July 2015 decision, R. 39–40 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.07, 201.15). In reaching these conclusions, the ALJ found that Dr. Hensley's testimony characterizing Debra's past relevant work as "Vice President (DOT # 189.117-034): sedentary, skilled, SVP 8" was "more accurate" than Ms. Wells's testimony describing this same work as "Branch Manager (DOT # 186.167-086): sedentary, skilled, SVP

---

[4] "For the majority of individuals who are age 50 or older and who are limited to the full range of sedentary work, the [Commissioner's] rules and guidelines in appendix 2 require a conclusion of 'disabled'" at step five of the disability determination process. SSR 96-9p, 1996 WL 374185, at *3. (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.01–201.16)). Individuals who have "special skills or experience relevant to sedentary work" existing in the national economy are the primary exception to this rule. 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.00(c); *see, e.g.*, *id.* §§ 201.07, 201.15 (directing that a person age 50 or older is "not disabled" if she can perform the full range of sedentary work, has at least a high school education, and her "skilled or semi-skilled" past relevant work required skills that are "transferable" to other skilled or semi-skilled sedentary occupations). The regulations specify how ALJs must evaluate "[t]ransferability of skills for persons of advanced age" who are limited to sedentary work. 20 C.F.R. §§ 404.1568(d)(4), 416.968(d)(4).

8."[5] R. 38 (citing R. 82–84); *see* R. 1093–96. He also credited Dr. Hensley's prior testimony that

Debra had acquired certain skills while working as a vice president (DOT # 189.117-034) that

transferred to the two other skilled sedentary occupations, both of which were also in the banking

industry. R. 39–40; *see* R. 1091–94. Conversely, Ms. Wells had testified that Debra's past work

as a branch manager (DOT No. 186.167-086) did not utilize any "skills that are directly

transferable into another [sedentary] job." R. 85; *see* R. 40 (citing R. 85–87); R. 1093 (citing R.

84–86). ALJ Lewandowski found Ms. Wells's testimony "internally inconsistent" and "in

---

[5] The Dictionary of Occupational Titles ("DOT") is an administrative guidebook approved for use in Social Security disability determinations. *See Powell v. Astrue*, No. 6:09cv1968, 2010 WL 3168308, at *16 n.7 (D.S.C. May 4, 2010); *Tyler v. Weinberger*, 409 F. Supp. 776, 791 (E.D. Va. 1976). "[It] is the Commissioner's primary source of reliable job information." *Powell*, 2010 WL 3168308, at *16 n.7 (citing 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1)). Each DOT number corresponds to a different occupational title(s), and contains information about that occupation's usual job duties, physical strength and general educational development ("GED") demands, and specific vocational preparation ("SVP") level. *See generally* U.S. Dep't of Labor, DOT app. C §§ II–IV, 1991 WL 688702 (4th rev. ed. 1991). The strength demands have the same definitions as in the Commissioner's regulations. *See id.* § IV, 1991 WL 688702; 20 C.F.R. §§ 404.1567, 416.967. The GED demands "embrace[] those aspects of education (formal and informal) [that] are required of the worker for satisfactory job performance," in particular the job's reasoning, math, and language skill levels. *See* DOT app. C § III, 1991 WL 688702. The SVP level is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* § II, 1991 WL 688702.

Example: DOT No. 186.167-086 (Strength: S; GED: R5, M4, L5; SVP: 8) corresponds to the occupational title "Manager, financial institution." DOT 186.167-086, 1991 WL 671339. This occupation is "sedentary" exertion work and involves tasks at Reasoning level 5, Math level 4, and Language level 5. *Id.* These GED levels are at the high-to-highest end of the applicable rating scales. *See* DOT app. C § III (R: 6 levels; M: 6 levels; L: 5 levels), 1991 WL 688702. They therefore correspond to "skilled" work, which requires exercising judgment to make work-related decisions and "may require dealing with people, facts, or figures or abstract ideas at a high level of complexity," 20 C.F.R. §§ 404.1568(c), 416.968(c). *See, e.g.*, *Shirley H. v. Kijakazi*, --- F. Supp. 3d ---, 2024 WL 38738, at *6 (D.S.C. Jan. 3, 2024) (reasoning level 5); *Solomon v. Comm'r of Soc. Sec. Admin.*, 376 F. Supp. 3d 1012, 1021 (D. Ariz. 2019) (math level 4); *Bentulan v. Berryhill*, No. 3:15cv381, 2017 WL 571502, at *3 (E.D. Tenn. Feb. 13, 2017) (language level 5); *accord* DOT 186.167-086, 1991 WL 671339 (job description; reasoning level: 5, definition; math level: 4–algebra, geometry, shop math; data coordinating: significant; making judgments and decisions). SVP level 8 means that a typical worker needs "[o]ver 4 years up to and including 10 years" to learn how to be an average manager at a branch or office of a financial institution. DOT 186.167-086, 1991 WL 671339. This occupation also requires a "high degree" of learning, verbal, and numerical "aptitude ability." *See id.* (capitalization altered); *accord* R. 940 ("[T]he record shows that [Debra] has *highly skilled* past relevant work as a branch manager with an SVP of eight and acquired skills that are clerical, professional, administrative, *and* managerial in nature." (emphasis added)).

conflict with" Dr. Hensley's prior testimony. R. 40. He relied on Dr. Hensley's prior testimony

to support both his characterization of Debra's past relevant work (Vice President, DOT No.

189.117-034) at step four and his findings at step five that Debra had "acquired job skills" in this

work that transferred to two other skilled sedentary occupations. R. 39–40; *see* R. 1095.

Debra appealed ALJ Lewandowski's unfavorable decision to this Court. *See* R. 1085–86.

As relevant here, she argued that ALJ Lewandowski "erred by giving Dr. Hensley's testimony in

her prior case greater weight than the testimony of Ms. Wells, and by finding that she would

have transferable skills to perform other sedentary employment." R. 1094. "Debra assert[ed] that

she [was] entitled to benefits because she is limited to a sedentary work level, does not have

transferable skills, and cannot return to her past relevant work" in the banking industry. *See id.*;

20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.06, 201.14. In August 2020, then-United States

Magistrate Judge Robert S. Ballou issued a report and recommendation proposing that the

presiding District Judge remand the Commissioner's final decision under the fourth sentence of

42 U.S.C. § 405(g). Judge Ballou explained that "it [was] clear from the ALJ's decision that he

viewed Ms. Wells' testimony as contradictory to Dr. Hensley's and based his [step-four] finding

that Debra can perform her past work entirely on Dr. Hensley's characterization of [this] past

work." R. 1095. The ALJ's reliance on Dr. Hensley's characterization of Debra's past work, and

his express rejection of Ms. Wells's testimony "as 'inconsistent'" with that characterization, also

affected the ALJ's transferable skills analysis at step five. *See* R. 1095–96 (quoting R. 38). Both

issues were potentially dispositive of Debra's entitlement to disability benefits. *See* R. 1095–97.

"The ALJ's reliance on vocational expert testimony from Debra's prior disability case

[was] not *per se* improper." R. 1095. Judge Ballou explained that it was "problematic in this

case," however, because the transcript of the May 2015 administrative hearing was not part of

7

the "certified copy of the transcript of the record" before the Court in August 2020. *Id.* (quoting

42 U.S.C. § 405(g)). Whenever a final decision on a DIB or SSI claim is appealed to federal

district court, the Act "requires 'the Commissioner of Social Security [to] file a certified copy of

the transcript of the record including the evidence upon which the findings and decision

complained of are based.'" *Id.* (quoting 42 U.S.C. § 405(g)). The record that the Commissioner

filed in Debra's then-pending appeal included ALJ Lewandowski's July 2015 decision denying

Debra's prior claims, but it did not include a transcript of Dr. Hensley's May 2015 testimony. *Id.*

Without that transcript, Judge Ballou could not "determine if substantial evidence support[ed]

the ALJ's decision to give Dr. Hensley's opinion greater weight than Ms. Wells' testimony." *See*

R. 1096–97. In September 2020, the presiding District Judge remanded Debra's case to the

Commissioner for further consideration "consistent with" Judge Ballou's report and

recommendation.[6] R. 1086 (citing 42 U.S.C. § 405(g) (sentence four)).

**

In December 2020, the Appeals Council vacated the Commissioner's final decision and

remanded Debra's concurrent DIB/SSI claims to an ALJ for further proceedings. *See* R. 1101–

02. In doing so, it noted that Debra had "filed a subsequent claim for [SSI] disability benefits on

July 10, 2019," and that Virginia DDS "found [her] disabled as of July 10, 2019." R. 1101. The

Appeals Council "affirmed" this fully favorable determination, but found that "the period prior to

July 10, 2019 require[d] further adjudication." *Id.* It instructed the next ALJ to offer Debra

another hearing, take any steps "needed to complete the administrative record[,] and issue a new

---

[6] The certified copy of the record filed in the pending action includes a transcript of testimony given at the May 2015 administrative hearing. *See* R. 1353–56.

decision for the period prior to July 10, 2019." R. 1102. The DIB/SSI claims that Debra filed in the fall of 2015 were both at issue during this relevant period. *See* R. 1101–03.

In January 2022, Debra appeared with counsel and testified at her third hearing before ALJ Lewandowski. *See* R. 1032–70. Dr. Hensley testified for the second time. R. 1034–69. The testimony at this hearing focused on Debra's numerous job titles and responsibilities during her lengthy career working at a branch of a national bank, as well as how Dr. Hensley characterized this past work activity and whether Debra acquired any specific skills that were transferable to other skilled sedentary jobs in the banking industry. *See* R. 1039–65. Debra testified that, while she was eventually given a "Vice President" title with more pay, her actual job duties did not change. *See* R. 1041–47, 1050–63. She "still [had] the same role" as the bank's "branch manager." R. 1043; *see* R. 939, 986–87. Dr. Hensley initially testified that Debra's past work "appear[ed] to be a composite job" of Vice President (DOT No. 189.117-034) and "bank branch manager" (DOT Nos. 186.117-034 or 186.167-086).[7] R. 1044–45. He opined that the physical strength needed to do Debra's actual duties in this composite job was "more light than it [was] sedentary."[8] R. 1047.

Dr. Hensley also testified that a hypothetical person matching Debra's RFC, age category, education, and work history, R. 1045; *see* R. 962, 985, 988, could be a Vice President,

---

[7] Regarding the branch manager position, Dr. Hensley testified that "either [DOT] code applies" because "[t]hey're both an SVP 8, sedentary, and they both have the same description as to what the individual does." R. 1044–45.

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). Aside from the amounts of weight that a person must lift/carry, *see id.* §§ 404.1567(a)–(b), 416.967(a)–(b), "[t]he major difference between sedentary and light work is that most light jobs" require standing or walking for "most of the workday," SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires six hours of standing and/or walking during an eight-hour day, SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983), whereas sedentary work only requires about two hours, *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010).

DOT No. 189.117-034, or a Branch Manager, DOT No. 186.117-034 and/or DOT No. 186.167-086, as these skilled sedentary occupations are described in the DOT, R. 1045, 1063–64. Further limiting this person to "unskilled work," however, "obviously" meant that "she can't go back to any of her past work." R. 1066 (ALJ: "Is that correct?" Dr. Hensley: "That's right, [and] there would be no transferable skills."); *accord* R. 1401 (ALJ: "If I added to my first hypothetical that the individual was able to understand, remember and carry out simple instructions, and perform simple tasks, then that individual could no longer perform the bank manager position because of the skill level?" Ms. Wells: "That's right.").

Relevant to step five, Dr. Hensley testified that Debra had acquired the following "transferable skills" from "both" her Vice President job and her Branch Manager job:

> the knowledge of banking regulations, banking regulations and . . . the financial parameters of loans like what percentage of a loan the bank would make, what level of interest the bank would set on that loan concerning the risk factors of the loan, those are all banking regulations based on banking laws and banking parameters as determined by . . . the Federal Government, customer relation skills, management skills and supervisory skills, interviewing skills.

R. 1048. He opined that these skills transferred to two other skilled sedentary occupations in the banking industry: Loan Interviewer (DOT No. 241.367-018, SVP 6); and Loan Officer (DOT No. 186.267-018, SVP 7). *Id.* These are the same transferable skills and alternative occupations that Dr. Hensley identified at the hearing on Debra's prior claims in May 2015. R. 1353–55; *see also* R. 1399 (June 2017). Dr. Hensley also testified that Debra would not "require any additional training in order to then [sic] perform these other two jobs[.]" *See* R. 1049.

Conversely, Ms. Wells had testified in June 2017 that Debra's past work as a "Branch Manager" (DOT No. 186.167-086) did not use "skills that are directly transferable into" either alternative occupation, R. 1399, because supervising a subordinate employee performing the job involves "different skill sets" than doing the job itself, R. 1400 ("[T]hat's the thing about the

branch manager. Not all of them can do every single job that's underneath them without some significant other training."). She opined that Debra would "need significant other training" to do the Loan Interviewer job. *Id.* Debra "could probably do" the Loan Officer job because she "did loan officer" tasks while working as a Branch Manager, but "direct transferability of skills" between those occupations was absent or lacking. *See* R. 1398–1401. Dr. Hensley disagreed with Ms. Wells's testimony. *See* R. 1049. Asked to explain "the basis of [his] opinion," Dr. Hensley responded that Debra's "position as a branch manager and vice-president were both SVP 8. And it's my understanding . . . [that] she supervised people who did both of those jobs." *Id.* Finally, Dr. Hensley testified that "there would be no transferrable skills" if the hypothetical person, R. 1045, was further limited to "unskilled work." R. 1066; *accord* R. 1401 (ALJ: "And again there would be no transferable skills -- at that point?" Ms. Wells: "To unskilled work. Correct.").

In June 2022, Debra appeared with counsel and testified at another hearing before ALJ Lewandowski. R. 1000–30. Debra's attorney asked for this hearing so Debra could describe her medical conditions and functioning from June 2017 to July 10, 2019, the date Virginia DDS found her disabled on the subsequent SSI claim. *See* R. 1001, 1019–20, 1022–24. Debra had last testified at a hearing on June 28, 2017, meaning there was a 23-month "period that wouldn't have been covered by testimony" already in the record. R. 1001. No VE testified at the hearing in June 2022.

ALJ Lewandowski issued an unfavorable decision on July 20, 2022. *See* R. 951–90. At step one, he found that Debra had not engaged in substantial gainful activity between July 26, 2015, and July 9, 2019.[9] R. 956. At step two, he found that Debra had the following "severe"

_____

[9] These dates refer to Debra's "alleged onset date," R. 956, and "established" disability onset date, respectively. *See* SSR 83-20, 1983 WL 31249, at *1–4 (Jan. 1, 1983). They bookend "the period at issue" in ALJ Lewandowski's written decision. R. 953; *see generally* R. 956–90. The ALJ also found that Debra met the Act's insured-status requirements through December 31, 2015. R. 956. That date is material to her

medically determinable impairments ("MDIs") during this relevant period: "asthma; sacroiliac joint dysfunction; sacral fracture; bilateral total hip arthroplasty, with revision on the left; migraines; right ankle fracture; and lumbar degenerative disc disease." *Id.* ("The above [MDIs] satisfied the duration requirement and significantly limited the claimant's ability to perform basic [physical] work activities. . . during the period at issue. Therefore they were 'severe' within the meaning of the regulations."); *see* 20 C.F.R. §§ 404.1522(b)(1), 416.922(b)(1) (basic physical work activities). He found that Debra's mental MDIs "of anxiety, depression, and alcohol abuse, considered singly and in combination, did not cause more than minimal limitation in [her] ability to perform basic mental work activities, and were therefore non-severe" during the relevant time. R. 957; *see* 20 C.F.R. §§ 404.1522(b)(3)–(6), 416.922(b)(3)–(6) (basic mental work activities). As part of this analysis, the ALJ found that Debra's mental MDIs caused "no limitation" in adapting or managing herself, R. 960, and "a 'mild' limitation" in the broad functional areas of understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and interacting with others, R. 958–60. *See* 20 C.F.R. §§ 404.1520a(c)–(d), 416.920a(c)–(d). At step three, he concluded that Debra's severe physical MDIs did not meet or medically equal the relevant Listings. R. 961 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.15, 1.16, 1.17, 1.18, 1.19, 3.03, 11.02).

Next, ALJ Lewandowski evaluated Debra's residual functional capacity ("RFC") based on her physical and mental MDIs in existence from July 26, 2015, through July 9, 2019. *See generally* R. 963–73 (summary of Debra's allegations and the medical evidence); R. 974–85 ("Analysis"). He found that Debra could have done sedentary work, except that she "required the

---

eligibility for DIB on the Title II claim that she filed in October 2015. *See Johnson*, 434 F.3d at 655–56. It is not relevant to her eligibility for SSI on the concurrent Title XVI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501.

use of a cane for prolonged ambulation," could "occasionally perform stooping but no other
postural activities," should avoid "concentrated exposure" to industrial hazards and pulmonary
irritants, and would have "be[en] absent from work for two consecutive days every three
months."[10] R. 962; *see also* R. 978. The ALJ's RFC finding, R. 962, does not limit Debra's
abilities (on a sustained basis) to meet the mental demands of "skilled work," 20 C.F.R. §§
404.1568(c), 416.968(c). R. 939–40, 957–60, 983–85; Def.'s Br. 20–21.

At step four, ALJ Lewandowski found that Debra had "past relevant work as a Branch
Manager (DOT # 186.167-086)," R. 985, which both Ms. Wells and Dr. Hensley had testified
"was an accurate description" of Debra's past work as generally preformed, R. 986 (citing 82–
85, 1044–45). He noted that the DOT classifies this occupation as "sedentary in exertion and
skilled (SVP 8) as generally performed," R. 986, and found that Debra's RFC would have
allowed her to do this job "based on its DOT description,"[11] R. 987. *See* R. 985–88. He based

---

[10] This RFC finding is substantively identical to the July 2015 RFC finding. *See* R. 979 (citing R. 98).
ALJ Lewandowski explained that the limitation related to periodic absences was specifically intended to
accommodate Debra's "alleged migraines to the extent that is reasonably consistent with the objective
medical evidence and [her] overall history of treatment" for that severe physical MDI. *See* R. 976–77. It
was not intended to accommodate Debra's alleged cognitive deficits and limitations related to her mental
MDIs. *See* R. 957–60, 979, 982–85.

[11] According to the DOT, a "Manager, financial institution" directs and coordinates activities at a branch
or office of a financial institution "to implement institution policies, procedures, and practices concerning
granting or extending lines of credit, commercial loans, real estate loans, and consumer credit loans."
DOT 186.167-086 (GED: R5, M4, L5; SVP: 8), 1991 WL 671339; *see* R. 940. She also "[e]stablishes
procedures for custody and control of assets, records, loan collateral, and security to ensure safe keeping"
and directs subordinate employees who are "collecting delinquent accounts, authorizing loans, or opening
savings account." DOT 186.167-086, 1991 WL 671339. She "[m]ay prepare financial and regulatory
reports"; "examine, evaluate, and process loan applications"; and "talk to customers to resolve account
problems." *Id.*; *see also* R. 940. "Reasoning: Level 5" means that the branch manager must be able to
"apply principles of logical . . . thinking to define problems, collect data, establish facts, and draw valid
conclusions"; to "interpret an extensive variety of technical instructions"; and to "deal with several
abstract concrete variables." DOT 186.167-086, 1991 WL 671339 (capitalization altered). "Math: Level
4" requires the "[p]ractical application of fractions, percentages, ratios and proportion, measurement,
logarithms, practical algebra, geometric construction, and essentials of trigonometry." *Id.* A branch
manager must be able to read "abstracts, financial reports, and legal documents," write manuals and
critiques, and be "[c]onversant in the theory, principles, and methods of effective and persuasive
speaking, voice and diction, and discussion and debate." *Id.* (Language: Level 5). This job also requires

this finding on Dr. Hensley's testimony at the January 2022 hearing. *See* R. 987 (citing R. 1044–45, 1064); *see also* R. 986–87 (giving "little weight" to Dr. Hensley's opinion that Debra's "past work was a composite of Vice President and Branch Manager" because that opinion was "inconsistent with [Debra's] testimony and reports regarding her actual job duties"). ALJ Lewandowski noted that his finding that Debra could have returned to her Branch Manager job "as it was generally performed" was "alone . . . sufficient to establish that [she] was 'not disabled' during the period at issue." R. 988 (step four).

Nonetheless, the ALJ also concluded at step five that Debra was "not disabled" from July 26, 2015, through July 9, 2019, because her RFC, vocational profile, and "acquired jobs skills from past relevant work" would have allowed her to transition to two other skilled sedentary jobs (Loan Officer, DOT No. 186.267-018; Loan Interviewer, DOT No. 241.367-018) existing in the national economy.[12] R. 988–90. He based this finding on Dr. Hensley's January 2022 testimony that Debra's "past relevant work was skilled with a specific vocational preparation (SVP) of '8' and required the following skills: knowledge of banking regulations, banking laws, and financial parameters of loans; customer relation skills; management and supervisory skills; and interviewing skills." R. 988 (citing R. 1048–49). He also credited Dr. Hensley's testimony that Debra's "acquired job skills would transfer into" the Loan Officer and Loan Interviewer "jobs without additional training because [Debra] had supervised people who performed these jobs,

---

"significant" coordinating of data; a "high degree of aptitude ability" in general learning ability, verbal numerical, and numerical aptitude; and "making judgments and decisions" *Id.* (capitalization altered).

[12] *See generally* DOT 186.267-018, Loan Officer (Strength: S; GED: R5, M4, L4; SVP: 7; Data-Analyzing: Significant; General Learning Ability & Verbal Aptitude: High degree of aptitude ability; Numerical Aptitude: Medium degree of aptitude ability; Judgment: Making judgments and decisions), 1991 WL 671342; DOT 241.367-018, Loan Interviewer, Mortgage (Strength: S; GED: R4, M3, L3; SVP: 6; Data-Compiling: Significant; General Learning Ability, Verbal Aptitude & Numerical Aptitude: Medium degree of aptitude; Judgment: Making judgments and decisions), 1991 WL 672253.

and had herself worked as a loan offer [sic]." R. 989 (citing R. 1047–49, 1058–59); *see* 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.00(f). He explained that this "portion of Dr. Hensley's testimony seem[ed] generally consistent with [Debra's] testimony" that "she was a 'loan officer' and was involved in lending and loan interviews," R. 989 (quoting R. 1370), and that "she did 'whatever needed to be done' in the branch, either by doing it herself or by directing others to do it," *id.* (quoting R. 1046). *See* R. 1370–72 (June 2017); R. 1046–47, 1058–63 (Jan. 2022). Conversely, Debra's testimony describing her actual job duties "seem[ed] inconsistent" with Ms. Wells's opinion that Debra's "acquired job skills would not transfer directly into these [two] jobs without extra training, essentially because supervising these positions versus doing them would involve different skill sets." R. 989 (citing R. 1398–1400). ALJ Lewandowski credited Debra's testimony and rejected Ms. Wells's opinion.

The Appeals Council declined to assume jurisdiction over Debra's concurrent DIB/SSI claims in April 2023, R. 938–43, thereby making ALJ Lewandowski's July 20, 2022 decision "the final decision of the Commissioner of Social Security after remand by the court," R. 942. This appeal followed. The question is whether substantial evidence supports the ALJ's decision that Debra was "not disabled" prior to July 10, 2019, because, notwithstanding the combined limiting effects of her physical and mental impairments, she retained the RFC to work full-time as a Branch Manager, a Loan Officer, or a Loan Interviewer as any of these "skilled" occupations are generally performed in the national economy. *See* R. 985–90.

## III. Discussion

Debra objects to the Commissioner's denial of benefits on four grounds. *See generally* Pl.'s Br. 29–32, 36–37 (non-severe mental MDIs, medical opinion evidence, mental RFC analysis), 32–34 (analysis of past relevant work), 34–38 (transferable skills analysis), 39–44

15

(pain analysis and activities of daily living). Her objections related to the ALJ's analysis of her mental MDIs, *id.* at 29–32, 36–37, are persuasive and warrant reversing and remanding the Commissioner's unfavorable decision.[13] I will also address other clear legal errors in this ALJ's RFC assessment, *see, e.g.*, *id.* at 40–44 (activities of daily living), so that those mistakes are not repeated if Debra's case is remanded for the second time.

Debra challenges the ALJ's step-two finding that her anxiety, depression, and alcohol abuse were "not severe" insofar as those MDIs (alone or combined) caused "no more than 'mild' limitations" in Debra's ability to concentrate, persist, or maintain pace, "and the 'evidence [did] not otherwise indicate that there was a more than minimal limitation' in [her] ability to perform basic work activities during the relevant period." *Id.* at 29 (quoting R. 960); *see* R. 957–60. She also objects that the ALJ's mental RFC assessment, *see* R. 982–85, does not logically explain how he found that Debra could have performed skilled work, which was critical to his "conclusion of non-disability" at step four and step five. Pl.'s Br. 29; *see also id.* at 30–32, 36–38. Relevant to both objections, Debra argues that the ALJ misapplied 20 C.F.R. §§ 404.1527, 416.927 (2015), in rejecting an examining psychologist's medical opinion that Debra was limited to performing "*simple and repetitive tasks* on a consistent basis *with no more than a moderate impairment* of concentration, persistence, or pace." Pl.'s Br. 29 (emphasis added); *see id.* at 30–32, 36–38; R. 958–59, 983–85 (citing R. 517–19 (Marvin Gardner, Ph.D.)).

---

[13] The ALJ's defective analysis of Debra's mental MDIs, *see* R. 958–60 (step two); R. 982–85 (RFC), is fatal to the Commissioner's denial of benefits at step four and/or step five of the disability determination. Pl.'s Br. 29; *see Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017) ("[B]ecause we cannot gauge the propriety of the ALJ's [mental] RFC assessment, we cannot say that substantial evidence supports the ALJ's denial of benefits."). Accordingly, I do not address Debra's objections concerning the ALJ's analysis of the conflicting VE testimony about her past relevant work or transferable skills. *See* Pl.'s Br. 34–39 (citing R. 985–89).

The ALJ's sedentary RFC finding, R. 962, does not limit Debra's capacity to sustain mental work activities—regardless of their skill level, complexity, or intellectual and emotional demands. R. 940, 957–60, 979, 982–89; *see* SSR 85-15, 1985 WL 56857, at *4–5 (Jan. 1, 1985). Had it further restricted her to "simple and repetitive work tasks," R. 518, 519, however, she would have been "limited to unskilled work,"[14] Pl.'s Br. 36–37. *See, e.g.*, *Dardozzi v. Colvin*, Civ. No. SAG-16-20, 2016 WL 6085883, at *5 (D. Md. Oct. 18, 2016) ("Unskilled work is defined as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.' Unskilled work, then, is tantamount to simple, routine tasks." (quoting 20 C.F.R. § 404.1568(a)). A limitation to "unskilled work," without more, would have entitled Debra to disability benefits as of July 26, 2015. Pl.'s Br. 36–37 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.06, 201.14); *accord* R. 1401, 1066.

A.    *The Legal Framework*

At step two, an ALJ must determine if the claimant's MDI(s), or combination of MDIs, qualifies as "severe" because it "significantly limits [her] physical or mental ability to do basic work activities."[15] 20 C.F.R. §§ 404.1520(c), 416.920(c); *see, e.g.*, *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) ("[M]edical conditions alone do not entitle a claimant to disability benefits; '[t]here must be a showing of related functional loss.'" (quoting *Gross v.*

---

[14] "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). An RFC restricting the claimant to "simple and repetitive work tasks," R. 518, 519, typically "reflects [a limitation to] unskilled work," *Emanual F. v. Saul*, Civ. No. DLB-19-3557, 2021 WL 1223829, at *2 (D. Md. Mar. 31, 2021). *See, e.g.*, *Mascio v. Colvin*, 780 F.3d 632, 635, 638 (4th Cir. 2015); *Yates v. Comm'r of Soc. Sec.*, No. 4:16cv59, 2018 WL 1249926, at *10–11 (W.D. Va. Feb. 16, 2018), *adopted*, 2018 WL 1247274 (W.D. Va. Mar. 9, 2018); *St. Clair v. Colvin*, No. 7:13cv571, 2015 WL 5310777, at *16 (W.D. Va. Sept. 11, 2015).

[15] Conversely, the claimant's "impairment or combination of impairments is not severe if it does not significantly limit [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), 416.922(a).

*Heckler*, 785 F.2d 1163, 1166 (4th 1986))). "Basic work activities . . . mean[s] the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1522(b), 416.922(b). Examples of basic work activities include physical functions like walking, standing, and sitting, *id.* §§ 404.1522(b)(1), 416.922(b)(1), and mental functions like "understanding, carrying out, and remembering simple instructions"; exercising judgment; "responding appropriately to supervision, co-workers and usual work situations"; and "dealing with changes in a routine work setting,"[16] *id.* §§ 404.1522(b)(3)–(6), 416.922(b)(3)–(6) (capitalization altered). Step two of the disability determination "is a threshold question," *Felton-Miller*, 459 F. App'x at 230, that "require[s] claimants to make a *de minimis* showing that their impairment is [functionally] severe enough to interfere with their ability to work," *Bowen v. Yuckert*, 482 U.S. 137, 153 & n.11 (1987) (quotation marks omitted). The ALJ's findings at step two also inform the more detailed RFC assessment used at steps four and five of the disability determination. *See Patterson*, 846 F.3d at 659; SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite the combined limiting effects of her MDIs and related symptoms or treatment. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller*, 459 F. App'x at 230–31, including objective clinical findings, medical opinions, and the claimant's own statements, 20 C.F.R. §§ 404.1545, 416.945. *See* SSR 96-8p, 1996 WL 374184, at *5.

---

[16] Agency policy "explicitly defines unskilled work in terms of basic [mental] work activities: 'The basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.'" *Adams v. Colvin*, No. 1:16cv733, 2016 WL 6238559, at *8 (quoting SSR 85-15, 1985 WL 56857, at *4); *see* 20 C.F.R. §§ 404.1522(b)(3), (5)–(6), 416.922(b)(3), (5)–(6) (listing the same mental functions as examples of basic work activities).

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019); *see generally* SSR 96-8p, 1996 WL 374184, at *1–7. First, "[t]he ALJ must consider all of the claimant's physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect the claimant's ability to work" for eight hours a day, five days a week. *Thomas*, 916 F.3d at 311 (cleaned up); *see* SSR 96-8p, 1996 WL 374184, at *3–4. Second, the ALJ's decision must "identify" each MDI-related functional limitation that is supported by relevant evidence in the record, "including the functions in" 20 C.F.R. §§ 404.1545(b)–(d), 416.945(b)–(d). SSR 96-8p, 1996 WL 374184, at *1; *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir 2016). The ALJ's actual RFC finding, 20 C.F.R. §§ 404.1520(e), 416.920(e), must "include those limitations that the ALJ considers credibly established," *Bryant v. Colvin*, No. 3:13cv349, 2014 WL 896983, at *1, *12 (E.D. Va. Mar. 6, 2014). An ALJ's failure to expressly limit any specific functional capacity in his RFC finding implies that the ALJ found no "credibly established" restriction or limitation on the claimant's capacity to perform that function in a competitive work setting for eight hours a day, five days a week. *See Monroe*, 826 F.3d at 179; *Hines*, 453 F.3d at 563; *cf.* SSR 96-8p, 1996 WL 374184, at *3 ("[W]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the [ALJ] must consider the individual to have no limitation or restriction with respect to that functional capacity.") .

Finally, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. The ALJ has

broad (but not unbounded) discretion to determine whether an alleged functional limitation is supported by or consistent with other relevant evidence in the claimant's record. *See Hines*, 453 F.3d at 564–66; *Perry v. Colvin*, 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC finding when he considered all the relevant evidence under the correct legal standards, *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and his written decision builds "an accurate and logical bridge from that evidence to his conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023). *See, e.g.*, *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12.

*

ALJs use a "special technique" to evaluate mental impairments. 20 C.F.R. §§ 404.1520a, 416.920a. At step two/three, the ALJ must "rate the degree" to which the claimant's mental MDI, or combination of mental MDIs, "interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis" in each of "four broad functional areas: . . . Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* §§ 404.1520a(c)(2)–(3), 416.920a(c)(2)–(3); *see Karen Ann G. v. Saul*, No. 19-972, 2020 WL 5369112, at *4 (D. Md. Sept. 8, 2020). These broad areas of mental functioning (the "paragraph B" criteria) describe the abilities that a person uses to function in *any* work setting—not just those she needs to do "unskilled work."[17] 20

---

[17] For example, "understand, remember, or apply information . . . . refers to the abilities to learn, recall, and use information to perform work activities." *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(1) (capitalization altered). "Examples include: understanding and learning terms, instructions, [or] procedures; . . . recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." *Id.* "Concentrate, persist, or maintain pace . . . . refers to the abilities to focus attention on work activities and stay on task at

C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A), (E)–(G); *see, e.g.*, *Shirley H.*, 2024 WL 38738, at \*5–6; *Dolly H. v. Kijakazi*, No. 2:22cv573, 2023 WL 6566603, at \*5–8 (S.D. W. Va. Aug. 31, 2023); *Eric E. v. Kijakazi*, No. 5:21cv566, 2022 WL 18213534, at \*7 (S.D. W. Va. Dec. 19, 2022), *adopted*, 2023 WL 131130 (S.D. W. Va. Jan. 9, 2023).

The ALJ must rate the claimant's overall degree of limitation in each paragraph B area using a standard five-point scale: none, mild, moderate, marked, and extreme limitation. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2). "No limitation (or none)" means the person can "function in this area independently, effectively, and on a sustained basis." *Id.* § 12.00(F)(2)(a). A "mild" limitation means the person's ability to function independently, effectively, and on a sustained basis "is slightly limited"; a "moderate" limitation means the person's functioning on that basis is "fair"; and a "marked" means that the person's functioning on that basis "is seriously limited." *See id.* § 12.00(F)(2)(b)–(d). An "extreme" limitation means that the person is "not able to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(F)(2)(e). "The ALJ's decision must show the significant history and medical findings considered and must include a specific finding as to the degree of limitation in each of the four functional areas." *Felton-Miller*, 495 F. App'x at 331 (citing 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4)).

---

a sustained rate" without regard to the task's complexity. *See id.* § 12.00(E)(3). "Examples include: initiating and performing a task that [the person] knows how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; . . . [and] sustaining an ordinary routine and regular attendance at work." *Id.* "To do a work-related task, [someone] must be able to understand <u>and</u> remember <u>and</u> apply information required by the task" and also "must be able to concentrate <u>and</u> persist <u>and</u> maintain pace in order to complete the task." *Id.* § 12.00(F)(3)(f)(i). "Limitation in any one of these [six] parts . . . may prevent [the person] from completing a work-related task." *Id.* Thus, "the greatest degree of limitation [for] any part of the area of mental functioning directs the [ALJ's] rating of limitation [for] that whole area of mental functioning." *Id.*

If the ALJ finds that the claimant's degree of limitation in all four paragraph B areas is "none" or "mild," then the claimant's mental MDI(s) will be found "non-severe" at step two, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." *Karen Ann G.*, 2020 WL 5369112, at *4 (alteration in original) (quoting 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)). If the ALJ finds that the claimant has a "moderate" limitation in at least one paragraph B area, then her mental MDI(s) will be found "severe" at step two, but not "'of [L]isting severity'" at step three. *See Adams*, 2016 WL 6238559, at *8 (quoting SSR 85-15, 1985 WL 56857, at *4). To satisfy the Listings, the person's severe mental MDI(s) "must result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2).

The ALJ's paragraph B ratings at step two/three also play an important role in a proper RFC assessment, which is a more "holistic and fact-specific evaluation" of the claimant's work-related abilities and limitations. *Patterson*, 846 F.3d at 659. As noted, the ALJ's decision must "identify" each MDI-related functional limitation that is supported by relevant evidence in the record, including the functions listed in 20 C.F.R. §§ 404.1545(b)–(d), 416.945(b)–(d). SSR 96-8p, 1996 WL 374184, at *1; *see Monroe*, 826 F.3d at 179. This list includes "understanding, remembering, and carrying out instructions" at any level of skill or complexity. *See* 20 C.F.R. §§ 404.1545(c), 416.945(c) (noting that a claimant's "limitations in [this functional area] . . . may reduce [her] ability to do past work and other work"). In doing so, the ALJ "must remember that the limitations [he] identified" in the broad areas of mental functioning at step two/three "are not an RFC assessment." SSR 96-8p, 1996 WL 374184, at *4. Those limitations are "used to rate the *severity* of mental impairments," *id.* (emphasis added), which the ALJ in this case explicitly

evaluated under the threshold "basic mental work activities" standard, R. 957. *See also* R. 958–60, 979–80, 985. "The mental RFC assessment used at steps 4 and 5 . . . requires a more detailed assessment by itemizing various functions contained in the broad categories," SSR 96-8p, 1996 WL 374184, at *4, to determine the claimant's "*maximum* remaining ability" to sustain mental work activities for eight hours a day, five days a week, *id.* at *2. *See, e.g.*, *Dolly H.*, 2023 WL 6566603, at *5–8; *Eric E.*, 2022 WL 18213534, at *7.

Debra's prevailing objections to ALJ Lewandowski's decision focus on his evaluation of the medical-opinion evidence. *See* Pl.'s Br. 29–32, 36–37. Relevant to Debra's DIB/SSI claims, "[m]edical opinions" are any "statements from acceptable medical sources that reflect judgments about the nature and severity of [Debra's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (2015).[18] ALJ Lewandowski was required to "evaluate" and determine "the weight [to] give" every medical opinion in Debra's record. *Id.* §§ 404.1527(c), 416.927(c). He needed to "consider all of the following factors in deciding the weight [to] give any medical opinion": (1) examining relationship; (2) treatment relationship, if any; (3) supportability; (4) consistency; and (5) specialization. *See id.* §§ 404.1527(c)(1)–(5), 416.927(c)(1)–(5); *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021) ("The ALJ's failure to consider each of the Section 404.1527(c) factors was error."). "If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. This explanation

---

[18] A different regulation applies to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1527c, 416.927c.

must "build an accurate and logical bridge from the evidence to [the ALJ's] conclusions." *Bilotta v. Saul*, 850 F. App'x 162, 169–70 (4th Cir. 2021) (quoting *Monroe*, 826 F.3d at 189).

B.     *Summary*

Most of the evidence in Debra's record relates to the alleged functionally limiting effects of her severe physical MDIs, particularly SI joint dysfunction, bilateral total-hip arthroplasties, right-ankle fracture, and lumbar degenerative disc disease. Debra's prevailing arguments on appeal relate to certain aspects of ALJ Lewandowski's analysis of her mental MDIs, *see* R. 957–60, 984–85, and of Dr. Garner's medical opinion that she was limited to performing "simple and repetitive tasks on a consistent basis with no more than a moderate impairment of concentration, persistence, or pace." Pl.'s Br. 29. I have tailored my summary of the record accordingly.

1.     *Relevant Evidence*

Debra has been diagnosed with an anxiety disorder and panic attacks, alcohol abuse disorder, major depressive disorder, and somatic symptom disorder with predominate pain. *See* R. 362, 480, 515, 560. Debra's internist/primary-care provider managed her prescription anti-anxiety and anti-depressant medications (Prozac, Buspar, Phenergan) during the period at issue. *See* R. 800–804, 809–14 (Dec. 2015); R. 781–85, 786–93, 795–99 (Jan., Mar. & May 2016); R. 555–60, 1391 (Feb. & June 2017); R. 1546–50, 1552–58 (Sept. & Nov. 2018); R. 1514–26 (Sept. 2019); *see also* R. 1480–82, 1493–95 (Mar. & Apr. 2021). She took Buspar three times daily, Prozac once daily, and Phenergan as needed for panic attacks. *See, e.g.*, R. 515, 802, 812. Debra consistently endorsed anxiety and/or depression at visits during the relevant time. *See* R. 556, 759, 785, 788, 798. The internist's "general/neurological" findings on physical exams in 2015–2018 show that Debra was always "oriented to person, place, and time . . . and in no acute distress." R. 803, 809–10, 1546; *accord* R. 559, 785, 1524, 1557. Debra also saw her cardiologist

and pain-management specialist during this time. The general/neurological findings from those providers' physical exams likewise show that she was "alert, oriented x3, and in no apparent distress." R. 364, 703, 708, 716, 1449, 1468; *accord* R. 734, 738, 745–46. Her mood and affect were "normal" and/or "appropriate" on physical exams in December 2015, R. 810, and the first half of 2017, *see* R. 708, 716, 732. She appeared "nervous" and/or "anxious" on other physical exams throughout 2015–2019. *See* R. 559, 734, 798, 803. The remaining physical exam notes do not contain any objective findings about Debra's psychological or cognitive state. R. 703–04, 785, 1152, 1468, 1546, 1557.

In January 2016, Debra's internist described an "unusual presentation of panic attacks." R. 798. He opined that Debra "[w]ould benefit from psychiatry vs counseling, however [her] finances limit this option." *Id.* Thus, he would "symptomatically treat [panic] symptoms to ensure she is able to take her medications (Prozac/Buspar)" for chronic anxiety and depression. *Id.* (capitalization altered). Debra noted that "she ha[d] tried oral Phenergan in the past, which wasn't particularly effective." *Id.* (capitalization altered). The internist prescribed Phenergan suppositories as needed and increased her Buspar to 15mg three times daily. *Id.* In March 2016 and May 2016, he noted that Debra's "anxiety/depression/panic attacks" were "controlled at present." R. 785, 789 (capitalization altered). He continued her existing medications at both visits. *Id.* In September 2018, Debra told the internist that her mood was "much better lately" just taking Prozac. R. 1552 ("Was using both Buspar and Prozac in the past. Now just using Prozac and states it is helping her mood immensely."). He noted that her depression "[s]eems to be well controlled." R. 1557.

\*

Debra saw Dr. Gardner for a consultative psychological exam on May 4, 2016. R. 514–
19. She took her Buspar and Prozac as prescribed. R. 515. Asked to describe her daily activities
and household chores, Debra responded, "'I can't vacuum or sweep. I can prepare simple meals
or wipe the counters down and dust. I can't carry laundry.'" *Id.*; *see also* R. 115 ("Doing
dishes/simple tasks takes a long time. . . . She does not carry her laundry.") (Dec. 2015). She
could go grocery shopping and use a microwave or stovetop. R. 515; *see also* R. 116 ("She uses
a cart to push/stability. She mainly sends family out for groceries. She cannot walk far at all.").
She took care of her own bills and finances. *See* R. 515. She visited friends and went out to
dinner "when [she] can." *Id.*

Dr. Gardner's "preliminary observations" show Debra had "good" eye contact and "a
friendly manner." R. 514. She "was quite talkative. . . . Her speech was spontaneous in the
beginning of [Dr. Gardner's] examination and became responsive as [the] interview progressed.
She spoke in a normal tone and at a normal rate. Her mood was euthymic" and her affect was
"appropriate." *Id.* She exhibited a "cooperative" attitude, *id.*, and "gave good effort on her
informal tests of cognitive functioning," R. 519. As part of his diagnostic interview, Dr. Gardner
asked Debra to "rate her chronic pain on a scale of 1 to 10 in her hip, lower back, groin, down to
her knees." *See* R. 514–15. Debra said, "on a bad day her pain level is a 7 to an 8 and on a good
day, a 2 to a 3." R. 515. She "had a total of 26 bad days and 4 good days in the past month." *Id.*
Debra did not rate her physical pain during Dr. Gardner's consultative exam. *See* R. 515–17; R.
519 ("This mental source statement does not reference any physical impairments that she may
have.").

Dr. Gardner also administered several "informal tests" to evaluate Debra's cognitive
functioning in the broader context of her mental-status exam. R. 517–18. His objective clinical

findings on that exam, 20 C.F.R. §§ 404.1502(f), 416.902(g), as well as his statements (in italics)

explaining their significance, *id.* §§ 404.1527(a)(1), 416.927(a)(1), are reproduced in their

entirety below.

MENTAL STATUS EXAM:

**Psychotic Symptoms**: The claimant was oriented x4. She denies any visual or
auditory hallucinations. She denies delusions.

COGNITIVE FUNCTIONING:

**Immediate Recall:**    The claimant's *immediate recall is moderately impaired.*
She was able to recall up to 6 digits forward and 4 digits backward.

**Recent Memory:**        The claimant's *recent memory is moderately impaired.* She
was able to remember 2 words given to her 4 minutes later with no prompts. A
prompt for the third word was not helpful.

**Long-term memory:** The claimant's *long-term memory is within normal limits*.

**General Information:** The claimant's *fund of general information is mildly
impaired*. She was able to answer correctly 4 out of 6 content questions. She was
able to give the names of 5 large cities and 5 famous people.

**Computation skills:** The claimant's *ability to do computation is mildly-to-
moderately impaired*. She was able to answer correctly 6 out of 8 digit problems
and 4 out of 5 word problems.

**Concentration:** The claimant was able to complete serial 2's in 8 seconds with no
errors. In her attempt to complete serial 3's she did so in 1 minute and 10 seconds
with 1 error. *She would have no more than moderate impairment of concentration,
persistence, or pace when attempting simple and repetitive work tasks.* She was not
able to complete serial 7's.

**Insight:** Her understanding of her mental illness *is good*. Her recognition of her
mental illness is good. Her compliance with treatment *is good*. Her *overall insight
is good*.

**Judgment:** Her *capacity to make sound and reasonable decisions is fair*. Her
ability to *ask hypothetical questions and make reasonable responses is good*. Her
overall judgment *is fair-to-good*.

**Abstract Thinking:** The claimant's *ability to think abstractly is mildly impaired*.
She was able to give a meaning to 2 of 3 proverbs. She was able to complete
correctly 4 out of 5 similes.

R. 517–18 (italics added); *see also* R. 514–17, 519 (summary of Debra's statements as to her

long-term history and insight into her mental illness). Dr. Gardner diagnosed Debra with

"somatic symptom disorder with predominate pain, moderate"; alcohol use disorder, "mild, provisional"; unspecified depressive disorder, "moderate"; and unspecified anxiety disorder, "moderate." R. 518. "Her prognosis for her psychiatric symptoms would be fair with continued adherence to psychiatric treatment." R. 519.

Dr. Gardner's consultative psychology report concludes with the following medical source statement:

> Debra A[.] is able to *perform simple and repetitive work tasks* and to *maintain regular attendance in the workplace.* She is able to *perform work activities* on a consistent basis *with no more than a moderate impairment of concentration, persistence, or pace.* This medical source statement does not reference any physical impairments that she may have. She is of normal intelligence and is able to *perform work activities* without special or additional supervision. She is able to complete a normal workday or workweek without interruptions resulting from her psychiatric condition. She was able to accept all instructions given by [Dr. Gardner] and to *respond appropriately*. She is *able to interact* with coworkers and with the general public. She is able to *deal with the usual stresses* encountered in competitive work when remaining abstinent from substances and adherent to psychiatric treatment.

R. 519 (italics and underline added). He also opined that Debra "would benefit from having a representative payee if awarded any benefits due to [her] history of alcohol use disorder." *Id.*

On May 5, 2016, Louis Perrott, Ph.D., reviewed Debra's medical records to determine the nature, severity, and functionally limiting effects of her alleged mental MDIs for DDS's initial review. *See* R. 117–19, 130–32. He concluded that Debra had an affective disorder and an anxiety disorder, both of which were "non severe." R. 118–19, 131–32. In reaching this conclusion, Dr. Perrott found that Debra's mental MDIs caused a "mild" restriction of her activities of daily living; "mild" difficulties with social functioning; "mild" difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. R. 119, 132. He explained that Debra had "been treated for anxiety and depression," but she had no history "of psychiatric hospitalization []or outpatient mental counseling. Her mental conditions appear to be stable and managed with medication. Pain seems to restrict her adaptive functioning more so

than her mental symptoms." *Id.* Dr. Perrott did not conduct a more detailed RFC assessment of Debra's ability to do specific mental work activities on a sustained basis. *See* R. 120–22, 133–35 (DDS medical doctor's physical RFC findings). Nonetheless, he appears to have discounted Dr. Gardner's function-by-function assessment, *see* R. 114, 127 (citing R. 519), because Dr. Gardner was not a "treating" source, he examined Debra "only one time," and there was no "longitudinal history" for Dr. Gardner to "fully evaluate" Debra's mental RFC. R. 120, 133 (Dr. Perrott explaining that he gave "other" weight to Dr. Gardner's medical opinion because it "cannot be given controlling weight" and for other reasons); *see* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

Julie Jenkins, Ph.D., reviewed Debra's updated medical records in August 2016. *See* R. 145–48. 158–60. She adopted Dr. Perrott's "mild" ratings and initial explanation in full. R. 147, 159–60. Dr. Jenkins added that Debra had reported "good control[] of anxiety and depression with current medications" in late May 2016, so her mental conditions "remain[ed] nonsevere." R. 146, 159. She did not conduct a more detailed RFC assessment of Debra's mental abilities and limitations. *See* R. 149–50, 162–63 (DDS medical doctor's physical RFC findings). DDS concluded that Debra was "not disabled" as of August 2016 because she could still do her past relevant work as a Branch Manager (DOT No. 186.117-034; SVP 8) as generally performed. R. 135–36, 151–52.

**

In June 2017, Debra testified that she could not return to her old job as a bank Branch Manager because she would "not [be] able to perform at the level" expected of someone in this skilled job. R. 1371. Specifically, she "would not be able to manage" the branch's annual budget, costs, balance sheets, or staff members; "to make sure that things were rectified and handled

correctly"; "to do some of the lending [activity] that [she once] did because it was very complex as far as understanding different characteristics of a loan, [including] the policies"; or to complete "a loan interview or any type of coaching session [without] be[ing] interrupted" by severe pain. R. 1370–71; *accord* DOT 186.167-086, 1991 WL 671339. She also had problems "handling stress [and] remembering things," R. 1371, which had interfered with her ability to complete "time sensitive" tasks like "getting a report in on time[] or answering emails" back when she still worked at the bank, R. 1372. By June 2017, Debra "ha[d] to keep a daily list of anything that [she] ha[d] to do, or that [she] need[ed] to remember, and then check it off. Otherwise [she] will not remember the simplest things . . . like what [she] wanted to cook for dinner." R. 1383. She "frequently" had trouble "concentrating and focusing on" conversations, television programs, and daily tasks. *Id.* Debra had delt with these "same" problems "all the way back to July, 2015." *Id.*

In June 2022, Debra testified about how constant hip, lower back, and leg pain continued to limit her exertional capacities and abilities to perform "household activities" from June 2017 to July 2019. *See* R. 1022–26; *accord* R. 115–16 (Dec. 2015); R. 515 (May 2016); R. 1375–77, 1380–82, 1385–86, 1389–90, 1393–95 (June 2017). She could carry laundry, sweep, and vacuum, but she had to take breaks and lie down several times during the day. R. 1023–24; *accord* R. 1375–77 (June 2017). She rested for at least 30 minutes each time because "that's how long it takes for an icepack or anything to work. And the longest [rest break] might be an hour-and-a-half." R. 1024; *accord* R. 1377 (June 2017). There "definitely" were times when Debra would "abandon tasks and just not complete them" because she "hurt too much." R. 1024.

B.      *The ALJ's Decision*

The ALJ discussed this evidence as part of his severity analysis at step two, *see* R. 957–60, and as part of his RFC assessment before step four, *see* R. 963–74, 982–85. At step two, he found that Debra's mental MDIs "of anxiety, depression, and alcohol abuse, considered singly and in combination, did not cause more than minimal limitation in [her] ability to perform basic mental work activities, and were therefore non-severe" during the relevant time. R. 957. As part of this threshold analysis, the ALJ found that Debra had "a 'mild' limitation" understanding, remembering, or applying information, R. 958, and "a 'mild' limitation" concentrating, persisting, or maintaining pace, R. 959–60.[19] These ratings mean that Debra had a "slight limitation" in her broad-based abilities to learn, recall, and use information to perform work activities on a sustained basis and to focus her attention and stay on task at a sustained rate without regard to the task's complexity. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)–(3).

The ALJ's decision shows that he "considered" the following evidence in concluding Debra had only mild limitations in these two paragraph B categories: (1) Debra's June 2017 testimony that she "had problems" with her memory, concentration, and focus, *see* R. 1383; (2) some of Dr. Gardner's mixed findings on Debra's May 2016 psychological exam, as well as Dr. Gardner's medical opinion that specific abnormal findings signified "moderately impaired" immediate recall and recent memory" and "no more than moderate impairment of concentration, persistence or pace," R. 517–19; (3) Debra's reported abilities to drive, go grocery shopping, handle her own bills and finances, prepare meals in a microwave and on a stovetop, and help an elderly relative with "various simple household tasks," R. 515, 1393–95; and (4) the internist's treatment notes showing that Debra's "anxiety and depression continued to be managed" with medication, *see* R. 734, 793, 1557. *See* R. 958–60 (citing R. 515, 517–19, 734, 793, 1383, 1393–

---

[19] Debra does not challenge the ALJ's ratings in the other paragraph B categories.

95, 1557). He also cited medical records from Debra's internist, cardiologist, and pain-management specialist showing "that she was alert and oriented" on physical exams from November 2015 to March 2019. R. 959 (citing R. 364, 703, 708, 716, 738, 759, 772, 785, 1449, 1468, 1546, 1557); *see also* R. 958 (same). These records did "not reflect complaints of symptoms or observed deficits related to" either paragraph B area. R. 958 (citing R. 703, 708, 716, 738, 759, 772, 785, 1449, 1468, 1546, 1557); *see also* R. 959 (same).

The ALJ concluded that Debra's reported ability to do the "simple" daily activities and tasks listed above "would require *a basic level* of understanding, remembering, and applying information," R. 958 (emphasis added), and at least "*some* capability" to concentrate, persist, and maintain pace, R. 960 (emphasis added). *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(3)(b). He rejected Dr. Gardner's medical opinion that Debra "would have 'no more than a moderate impairment of concentration, persistence, or pace'" because he concluded that characterizing Debra's "degree of limitation in this area" as *moderate* "seem[ed] overstated relative to [Dr. Gardner's] own observations . . . , or other documented findings" on Debra's physical exams. R. 959 (citing R. 517–18, 1447–49, 1557). "For instance," Dr. Gardner had observed that Debra:

> was able to remember two out of three words given to her four minutes later with no prompts; correctly answer six out of eight digit problems and four out of five word problems; complete serial twos in eight seconds without errors; and complete serial threes in one minute and 10 seconds with one error, although she was not able to complete serial sevens.

R. 959 (citing R. 517–18). "Generally, treating providers did not document any outward inattentiveness, distractibility, or slowness in [her] clinical presentation, but noted only that she was alert and oriented" on physical exams. R. 959 (citing R. 364, 703, 708, 716, 738, 759, 772, 785, 1449, 1468, 1546, 1557). "Of note," Debra's internist and pain-management specialist did "not observe[] . . . [any] cognitive issues even when she complained of pain or other physical symptoms that could affect her ability to concentrate, persist, or maintain pace." *Id.* To support

the latter conclusion, the ALJ cited two physical exams from 2018–2019 where Debra was

"alert," "oriented," "in no apparent distress," and/or "had clear, spontaneous speech" despite

reporting chronic or worsening physical pain. *Id.* (citing R. 1552–57, 1447–49). He did not

explain why Dr. Gardner's proposed moderate limitations in both memory and concentration,

persistence, or pace "seem[ed] overstated relative to" these findings. Nor did he acknowledge

that Dr. Gardner had also observed that Debra was "oriented x4," R. 517, and that her speech

was both "spontaneous" and "responsive" during his more detailed psychological exam in May

2016, R. 514. *See* R. 984 (citing R. 514–17). He later relied on Dr. Gardner's normal findings to

help support his RFC assessment, however. *See* R. 984–85.

The ALJ found that Debra had a "mild" limitation in both understanding, remembering,

or applying information and concentrating, persisting, or maintaining pace. R. 958, 960. He

based these ratings "on the overall record," R. 958, and "on the totality of the evidence," R. 960,

respectively. Despite recognizing that Debra and Dr. Gardner identified "moderate" or greater

limitations in both broad functional areas, *see* R. 958–60, 963–95, 984–85 (citing R. 517–19,

1370–72, 1383), the ALJ did not logically explain at step two why he nonetheless picked "mild"

ratings.

The ALJ also recognized (correctly) that the "limitations identified in the 'paragraph B'

criteria are not a residual functional capacity assessment," but are instead "used to rate the

[non]severity of mental impairments at step[] two." R. 960 ("The mental [RFC] assessment used

at septs four and five . . . requires a more detailed assessment."). He noted that his RFC finding,

R. 962, reflected Debra's "mild" degrees of limitation in understanding, remembering, or

applying information, and in concentrating, persisting, or maintaining pace, R. 958. *Accord*

Def.'s Br. 20–21. Indeed, with the exception of a brief discussion of the DDS reviewers' medical

opinions, R. 982–83, the ALJ's mental RFC analysis essentially repeats his findings, rationale, and citations from his threshold step two analysis, R. 984–85.

The ALJ summarized Debra's hearing testimony in greater detail as part of his RFC assessment. *See* R. 963–65. He noted that in June 2017 Debra "testified that she would not be able to return to her past work as a bank branch manager due to pain" and "problems with her memory," judgment, comprehension, concentration, persistence, and pace. R. 963 (citing R. 1370–72). "She would be unable to handle issues with the staff." *Id.* "She would not be able to perform the complex lending she used to do [because] she would not be able to understand the different characteristics of a loan or bank policies." *Id.* She had "difficulty with stress and problems with her memory." *Id.* "Before she was terminated from her job [in September 2010], she had difficulty completing her work in an timely manner[] and was feeling overwhelmed." *Id.*; *see* R. 985 (citing R. 1322). Her "abilities to concentrate and remember were poor." R. 964. By June 2017, "[s]he had to write down what she needed to do each day, or else she would forget. [She] had trouble concentrating on TV shows and conversations." *Id.* (citing R. 1382). "Regarding activities of daily living," Debra testified in June 2017 that she "visited her elderly mother-in-law in her home" roughly "once every other week." R. 964 (citing R. 1393–95). Debra "prepared simple meals for her mother-in-law to eat, brushed her hair, and drove her to appointments. [She] put dishes in the dishwasher but did not do any other cleaning." *Id.* In June 2022, Debra testified that she "had difficulty performing household chores, such as lifting and carrying laundry," vacuuming, and sweeping. R. 965 (citing R. 1023–24). "She had to take breaks when doing these activities due to pain. She would lie down several times through the day for pain relief, and would lie down for about 30 minutes to 1.5 hours" each time. *Id.*

The ALJ found that Debra's physical and mental MDIs "could reasonably be expected to cause [her] alleged symptoms during the period at issue," but that Debra's statements describing "the intensity, persistence, and limiting effect of these symptoms [were] not entirely consistent with the medical evidence and other evidence for the reasons explained" later in his decision. R. 975; *see also* R. 978, 985. While the ALJ's specific "reasons" are not entirely clear, he appears to have concluded that Debra's statements were "not entirely consistent" with her "complete medical history related to" her severe *physical* MDIs, as well as her reported *physical* abilities to do certain *types* of activities during the relevant time. R. 978. *See also* R. 975–78 (discussing Debra's alleged pain and other symptoms caused by her physical MDIs and the resulting exertional, environmental, and work-place attendance limitations in RFC finding).

For example, the ALJ explained that, between May 2016 and November 2018, Debra reported that she drove (a few miles from home, with a handicapped-parking placard); visited her elderly mother-in-law "about every other week and prepared meals" (in the microwave, "occasionally"); "put dishes in the dishwasher" (but did not do "any cleaning"); brushed her mother-in-law's hair and took her to the hair dresser ("occasionally"); fixed her own "simple" meals in the microwave or on a stovetop; could "wipe counters [and] dust" (but did not vacuum, sweep, or carry laundry); handled her own bills and finances; went grocery shopping; visited friends or went out to dinner ("When I can"); and went to the beach with friends (twice). R. 978 (citing R. 515, 713, 1389, 1393–95, 1541). The ALJ concluded that Debra's "activities [were] broadly consistent with an ability to perform a range of *sedentary work* as described in" his RFC finding. R. 978 (emphasis added). But he did not say whether activities supported his conclusion that Debra could have sustained *skilled* sedentary work prior to July 10, 2019. R. 985–89.

35

Nor did the ALJ explain how he considered Debra's June 2017 testimony specifically describing how her longstanding problems with memory, concentration, persistence, and pace, R. 973–75, prevented her from doing many of the complex tasks that a Branch Manager, a Loan Officer, or a Loan Interviewer must be able to perform on a regular and continuing basis, R. 985–89. *See generally* DOT 186.167-086, Manager, financial institution (GED: R5, M4, L5; SVP: 8), 1991 WL 671339; DOT 186.267-018, Loan Officer (GED: R5, M4, L4; SVP: 7), 1991 WL 671342; DOT 241.367-018, Loan Interviewer, mortgage (GED: R4, M3, L3; SVP: 6), 1991 WL 672253. All three skilled jobs require "significant" work with data, making "judgments and decisions," and at least a "medium degree" of general learning ability, verbal aptitude, and numerical aptitude. *See generally id.*

Later in his decision, the ALJ also concluded that Debra "had the ability to perform *basic work activities* as described in" his RFC finding. R. 985 (emphasis added). As relevant here, the phrase "basic work activities" describes a person's broad-based capacities for "understanding, carrying out, and remembering *simple* instructions"; "responding *appropriately* to supervision, co-workers and *usual* work situations; and "dealing with changes in a *routine* work setting." 20 C.F.R. §§ 404.1522(b)(3), (5)–(6), 416.922(b)(3), (5)–(6) (emphasis added). Agency policy "explicitly defines *unskilled* work in terms of *basic work* activities: 'The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember *simple* instructions; to respond *appropriately* to supervision, coworkers, and *usual* work situations; and to deal with changes in a *routine* work setting." *Adams*, 2016 WL 6238559, at *8 (quoting SSR 85-15, 1985 WL 56857, at *4) (emphasis added). Using judgment is also a basic work activity, but unskilled work "needs little or no judgment to do simple duties that can be learned in a short period of time." 20 C.F.R. §§

36

404.1568(a), 416.968(a). The ALJ's RFC finding, R. 962, did not address Debra's capacity to perform any of these mental functions on a regular and continuing basis. R. 957–60, 985–89. He expressly rejected Dr. Gardner's medical opinion that Debra "was limited to simple and repetitive tasks," R. 985 (citing R. 519), which, if credited, would have reflected a limitation to "unskilled work." *See, e.g.*, *Emanual F.*, 2021 WL 1223829, at *2; *Dardozzi*, 2016 WL 6085883, at *5. The ALJ's decision as a whole strongly suggests that he did not think there were any "credibly established" limitations, *Bryant*, 2014 WL 896983, at *12, on Debra's ability to sustain skilled work tasks. *See* R. 957–60, 983–89; *accord* Def.'s Br. 20–21. Skilled work does require a person to exercise sound judgment to make decisions and deal with people, facts, figures, or abstract ideas at a "high level of complexity." 20 C.F.R. §§ 404.1568(c), 416.968(c).

Finally, the ALJ considered Dr. Gardner's and the DDS reviewer's medical opinions. *See* R. 982–85. He gave "significant weight" to the DDS opinions that Debra "had 'mild' restriction of activities of daily living, 'mild' difficulties in maintaining social functioning, and 'mild' difficulties in maintaining concentration, persistence, or pace, applying the 'paragraph B' criteria found in an earlier version of the adult mental listings."[20] R. 982. He noted that medical opinions from DDS psychology consultants "generally are entitled to some weight based on their specialized expertise and understanding of the Social Security Administration's disability programs" and because these consultants "are well positioned to evaluate a person's longitudinal history based on their review of all evidence available at the time of their assessments." *Id. But see* 20 C.F.R. §§ 404.1527(c)(3)–(6), 416.927(c)(3)–(6).

---

[20] These criteria were revised in early 2017. *Trina R. v. Saul*, No. 5:18cv120, 2020 WL 3118414, at *8 (W.D. Va. Feb. 10, 2020). ALJ Lewandowski evaluated Debra's mental MDIs using the current criteria, which includes a new functional area of "understanding, remembering, or applying information." *See* R. 958.

The ALJ found that Dr. Perrott's and Dr. Jenkins's medical opinions in this case were "well supported and consistent with the totality of the evidence." R. 983. Specifically, their "characterization of [Debra's] treatment history [was] accurate" insofar as treatment notes showed that her anxiety and depression symptoms were "managed with routine medications prescribed by her primary care provider." *Id.* (citing R. 423, 734, 1552, 1557). He did not say whether "accurately characterizing" a claimant's mental-health treatment history spoke to the DDS medical opinions' supportability, to their consistency with other evidence in the record, or to some other factor. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (instructing that the weight given to nonexamining sources' "medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions"). The ALJ also found that their proposed "mild" ratings in the old paragraph B criteria—which addressed a claimant's MDI-related difficulties maintaining concentration, persistence, pace, but not any such difficulties understanding, remembering, or applying information—were "consistent with the objective medical evidence" showing that Debra "typically displayed appropriate mood and affect, or was not noted to have obvious abnormalities in her general mental state." *Id.* (citing R. 514, 708, 716, 734, 738, 829, 1461, 1546, 1557). He did not explain how these clinical findings (or lack thereof) showed that Debra had any limitation in the current paragraph B criteria.

The ALJ gave "some weight" to Dr. Gardner's medical opinion, which he quoted in its entirety immediately before explaining the various factors that he considered. R. 983 (quoting R. 519). He expressly "considered that Dr. Gardner is a mental health specialist who personally evaluated" Debra in May 2016, but that Dr. Gardner "did not treat" Debra for these conditions. *Id.*; *see* 20 C.F.R. §§ 404.1527(c)(1), (5), 416.927(c)(1), (5). He also nominally invoked the supportability and consistency factors, 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4), in

deciding to give "little weight" to Dr. Gardner's opinions that Debra "was 'moderately' limited in concentration, persistence, or pace, and was limited to simple and repetitive tasks," R. 985, and "some weight" to his subsequent functional assessment, R. 984. *See* R. 983–85.

The ALJ found "that portions of Dr. Gardner's opinion—specifically, the statements pertaining to [Debra's] abilities to [(1)] maintain regular attendance, [(2)] complete a normal workday and workweek, [(3)] interact appropriately with others, and [(4)] deal with usual work stresses—[were] generally supported by" several of Dr. Gardner's "independent observations" of Debra during the consultative psychological exam. R. 983–84 (citing R. 514–18). "Specifically," Dr. Gardner observed that Debra's attire and grooming were "appropriate"; she had "good" eye contact and her psychomotor activity was "normal"; her speech was both "spontaneous" and "responsive"; she spoke with "normal" rate and tone; her mood and affect were "euthymic" and "appropriate"; and she had a "cooperative" attitude. R. 984 (quoting R. 514). Dr. Gardner also noted that Debra's "overall insight appeared good, and her overall judgment appeared *fair-to-good.* She could give the meaning of *two out of three* proverbs, and *complete correctly four out of five* similes." *Id.* (emphasis added) (citing R. 518). The ALJ stated that Dr. Gardner's clinical findings quoted above "supported" those "portions" of Dr. Gardener's medical opinion that, at least on their face, suggest Debra would not have had any problems getting to work five days a week, working a full eight-hour day, interacting "appropriately" with others, and dealing with "usual" work stresses. *Id.* But he never explained how he concluded—*based on this evidence*— that Debra could actually do any of these things. *Cf. Woods*, 888 F.3d at 694. The ALJ also "said nothing about" Debra's ability to function on this basis, *Mascio*, 780 F.3d at 637, *assuming* that she was working full-time as a Branch Manager, Loan Officer, or Loan Interviewer. R. 985–89;

*see, e.g.*, SSR 85-15, 1985 WL 56857, at *4 ("In the world of work, losses of intellectual and emotional capacities are generally more serious when the job is complex.").

Moreover, the ALJ did not discuss other portions of Dr. Gardner's psychological report that are relevant to Debra's capacity to sustain skilled work. For example, Dr. Gardner cited Debra's *inability* to explain all seven "proverbs and similes" specifically to support his medical opinion that Debra's "ability to think abstractly [was] *mildly impaired*." R. 518. The ALJ noted Debra's partial completions on the proverbs-and-similes testing, but he did not mention Dr. Gardner's medical opinion that these results signified some degree of impairment in Debra's abstract thinking. Similarly, Dr. Gardner rated Debra's overall judgment "fair-to-good" because he thought her "capacity to make sound and reasonable decisions" was only "fair," whereas her "ability to ask hypothetical questions and make reasonable responses" was "good." *Id.* At the very least, Dr. Gardner's findings and medical opinions materially undermine the ALJ's conclusion that Debra could sustain competitive work that required her to exercise sound judgment and deal with numbers and abstract ideas at a high level of complexity. 20 C.F.R. §§ 404.1568(c), 416.968(c). The ALJ did not even mention them.

The ALJ also concluded that Dr. Gardner's statements concerning the four work-related areas listed above were "generally consistent" with Debra's own description of her activities in May 2016; the "conservative management of [her] mental health conditions with some relief reported"; and several physical exams showing that Debra's "mental status was usually normal or unremarkable during encounters with her own providers, with the exception of anxious mood or affect from time to time." *Id.* (citing R. 514–15, 708, 716, 734, 740, 829, 1461, 1552, 1557). He did not explain how Debra's statements that she "can prepare simple meals or wipe down counters and dust," go grocery shopping, use a microwave or stove, and handle her own bills and

40

finances—but she "can't vacuum or sweep" and "can't carry laundry," R. 515 —were

"consistent with" an ability work full-time, much less in a skilled professional workplace.

The ALJ gave "little weight to the portions of Dr. Gardner's medical opinion stating that

[Debra] 'is able to perform simple and repetitive tasks' and 'is able to perform work activities on

a consistent basis with no more than a moderate impairment of concentration, persistence, or

pace.'" R. 984 (quoting R. 519). He concluded that Dr. Gardner's proposed limitations in these

two areas were "not fully supported" and were "inconsistent with other evidence." *See* R. 984–

85. As he did at step two, R. 959, the ALJ cited Dr. Gardner's objective findings that Debra:

> was able to *remember two out of three words given to her four minutes later* with
> no prompts; *correctly answer six out of eight digit problems* and *four out of five
> word problems*; complete serial twos in eight seconds without errors; and *complete
> serial threes in one minute and 10 seconds with one error*, although she *was not
> able to complete serial sevens.*

R. 984 (citing R. 517–18) (italics added). From the ALJ's perspective, "[t]hese findings [did] not

obviously correspond to a 'moderate' degree of limitation in concentrating, persisting, or

maintaining pace." *Id.* Notably, Dr. Gardner cited the italicized findings specifically to support

his medical opinions that Debra's "recent memory [was] *moderately* impaired"; that her basic

computation skills were "mildly-to-*moderately* impaired"; and that "[s]he would have no more

than no more than a *moderate* impairment of concentration, persistence, or pace *when attempting

simple and repetitive work tasks*," R. 517–18 (emphasis added). The ALJ did not explain why he

rejected Dr. Gardner's interpretation of his own findings out of hand. *See* 20 C.F.R. §§

404.1527(c)(3), 416.927(c)(3) ("Supportability. The more a medical source presents relevant

evidence to support a medical opinion, particularly medical signs and laboratory findings, the

more weight we will give that opinion.").

Finally, the ALJ explained (correctly) that Debra's imperfect "performance on the

cognitive tasks during [Dr. Gardner's] consultative examination must be viewed in the context of

the entire record." R. 984. As he did at step two, R. 959, he noted Debra's treating physicians

"[g]enerally . . . did not document any outward inattentiveness, distractibility, or slowness in

[her] clinical presentation, but noted only that she was alert and oriented" on physical exams. R.

984 (citing R. 703, 708, 716, 738, 759, 772, 785, 1449, 1468, 1546, 1557). He again found it

noteworthy that Debra's internist and pain-management specialist did "not observe[] . . . [any]

cognitive issues even when she complained of pain or other physical symptoms that could affect

her ability to concentrate, persist, or maintain pace." *Id.* He cited the same two physical exams

from 2018–2019 where Debra was "alert," "oriented," "in no apparent distress," and/or "had

clear, spontaneous speech" despite reporting chronic or worsening physical pain. R. 984–85

(citing R. 1552–57, 1447–49). But, as before, the ALJ did not explain how these unremarkable

findings—which Dr. Gardner also noted on his even more thorough mental-status and cognitive

functioning exam, R. 514, 518—justified giving "little weight" to Dr. Gardner's medical opinion

that Debra "was 'moderately' limited in concentration, persistence, or pace, and was limited to

simple and repetitive tasks," R. 985.

 The ALJ also did not explain how he considered Dr. Gardner's qualifying statement that

his functional assessment of Debra's ability "to perform simple and repetitive work tasks . . . . on

a consistent basis with no more than a moderate impairment of concentration, persistence, or

pace" did "not reference any physical impairments that she may have." R. 519. Put differently,

Dr. Gardner's medical opinion describes Debra's *mental* RFC to "perform simple and repetitive

work" activities *without* regard to her chronic physical pain. *See id.* The ALJ appears to have

overlooked this important context in rejecting these two portions of Dr. Gardner's opinion.

*C.     Analysis*

42

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's decision." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). "[T]he ALJ must *both* identify evidence that supports his conclusion[s] *and* build an accurate and logical bridge from that evidence to his conclusion[s]." *Woods*, 888 F.3d at 694. The "logical explanation" component is just as important as the other two. *Thomas*, 916 F.3d at 311. "Indeed, [Fourth Circuit] precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id.* (citing *Woods*, 888 F.3d at 694). ALJ Lewandowski's decision does not survive this deferential standard of review.

As relevant here, the ALJ concluded that Debra could perform "skilled" work, R. 985–89, and rejected "portions" of Dr. Gardner's medical opinion, R. 518–19, which would have supported finding that Debra's mental MDIs were "severe" insofar as they caused "moderate" limitations in certain paragraph B criteria and/or that Debra "was limited to simple and repetitive tasks," *see* R. 958–60, 983–85. I explain below why this ALJ's stated reasons for rejecting these portions of Dr. Gardner's medical opinion are not supported as a matter fact or law. Even if they were, however, the ALJ made other clear legal errors that justify reversing his denial of benefits and remanding Debra's case for a second time.

*

The ALJ gave "little weight to the portions of Dr. Gardner's opinion suggesting that [Debra] was 'moderately' limited in concentration, persistence, or pace and was limited to simple and repetitive tasks," R. 985, because he concluded that those two "limitations are not fully supported[] and are inconsistent with other evidence," R. 984. But he did not cite *any* specific evidence in the record that he apparently determined did not "fully support" or was "inconsistent with" Dr. Gardner's limitation *to simple, repetitive tasks*. R. 984–85. In fact, he did

43

not articulate a reason for that conclusion at all. *See* SSR 96-8p, 1996 WL 374184, at \*7 ("If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."). He only analyzed the portion of Dr. Gardner's opinion stating that Debra's mental MDIs caused "a 'moderate' degree of limitation in concentrating, persisting or maintaining pace." *Id.*; *see also* R. 958–60.

The ALJ also appears to have cherry-picked certain portions out of Dr. Gardner's opinion to support his non-disability finding, *see* R. 983–85 (citing R. 519), "while overlooking the [opinion's] broader import," *Testamark v. Berryhill*, 736 F. App'x 395, 398–99 (4th Cir. 2018). *See* R. 983–95. Read in context, Dr. Gardner's report makes clear that the first clause in his statement—i.e., that Debra "is able to perform simple and repetitive work tasks"—modifies all subsequent terms describing her remaining work-related abilities. R. 519; *see* R. 517–19. Indeed, Dr. Gardner's report explicitly defines Debra's mental RFC in terms of "basic mental work activities," R. 957; *see* 20 C.F.R. §§ 404.1522(b)(3)–(6), 416.922(b)(3)–(6); and "unskilled work," *Adams*, 2016 WL 628559, at \*8 (citing SSR 85-15, 1985 WL 56857, at \*4); 20 C.F.R. §§ 404.1568(a), 416.958(a). *See* R. 517–19. Eliminate the limitation to "simple and repetitive work tasks," R. 518, 519, and it is not at all clear that Dr. Gardner would have opined that Debra could "maintain regular attendance in the workplace"; complete "work activities" on a consistent basis "without special or additional supervision" and "with no more than a moderate impairment in concentration, persistence, or pace"; or "deal with the usual stresses encountered in competitive work," R. 519. Notably, Dr. Gardner's medical opinion is the only function-by-function assessment of Debra's ability to sustain mental work-related activities provided by an acceptable medical source in this case. *Compare* R. 517–19, *with* R. 119–23, 146–51.[21]

---

[21] It is also the only medical opinion indicating that Debra was more than "'mildly' limited" in the broad "functional area [of] understanding, remembering, or applying information," R. 958; *see* R. 517–19. The

The ALJ's rationale for rejecting Dr. Gardner's medical opinion that Debra had a "moderate" impairment maintaining concentration, persistence, or pace (when attempting simple and repetitive work tasks) is fatally flawed for two reasons. First, it "improperly substituted" the ALJ's lay opinion for Dr. Gardner's medical expertise "when evaluating the significance of [Dr. Gardener's] clinical findings" on Debra's psychological exam. *See Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 108 (4th Cir. 2020). Dr. Gardener opined that Debra's imperfect performance on "serial" numbers testing signified "no more than a moderate impairment of concentration, persistence, or pace when attempting simple and repetitive work tasks." R. 518; *accord* R. 519. The ALJ recited Dr. Gardner's findings on Debra's serial numbers testing—as well as his findings on cognitive tests designed to measure Debra's recent memory and basic computation skills—and concluded that that these "findings do not *obviously* correspond to a 'moderate' degree of limitation in concentration, persistence, or maintaining pace." R. 984; *accord* R. 959 (concluding that Dr. Gardener's opinion in this area "seem[ed] overstated relative to" the same findings, "or [to] other documented findings" that Debra was "alert and oriented" on physical exams). The ALJ did not give any reason for that conclusion. *See* R. 959–60, 983–85. Dr. Gardener is an examining psychologist, R. 983, who provided his expert opinion of Debra's work-related mental abilities and limitations based on his own findings on her clinical exam. *See* R. 517–19. The ALJ does not have medical expertise. He cannot reject a medical

---

DDS psychologists who reviewed Debra's records in May and August 2016 concluded that her mental MDIs were non-severe by "applying the 'paragraph B' criteria found in an earlier version of the adult mental listings" that rated the claimant's "restriction of activities of daily living"; "difficulties in social functioning"; and "difficulties in maintaining concertation, persistence, or pace." R. 982 (citing R. 118–19, 131–32, 146–47, 159–60). Those criteria were revised in early 2017. *Trina R.*, 2020 WL 3118414, at *8. The ALJ used the current criteria, which includes a new functional area of understanding, remembering, or applying information. *See* R. 958.

opinion based on his own interpretation of medical findings without providing a reasonable explanation that discusses relevant, contradictory evidence.

Moreover, the ALJ's decision to give more weight to the DDS's reviewers medical opinions identifying a mild limitation in concentration, persistence, or pace than to Dr. Gardner's opinion identifying a moderate limitation in that area, R. 983–85, "makes little sense" under the primary regulatory factors applicable here, *cf. Arakas*, 983 F.3d at 110–11 (treating physician). *See* 20 C.F.R. §§ 404.1527(c)(1), (3)–(4), 416.927(c)(1), (3)–(4). "Generally, [ALJs] give more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined" her. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Under the new regulation, "supportability and consistency are the most important" factors that the ALJ must consider in determining how persuasive he finds a medical opinion. *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023) (citing 20 C.F.R. § 404.1527c(b)(2)). Those factors were equally important under the old regulation applicable to Debra's claims. Indeed, unlike the other factors, "supportability" contains no caveat that its terms apply as a "general" rule. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "Supportability: *The more a medical source presents* relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, *the more weight we will give* that medical opinion. *The better an explanation a source provides* for a medical opinion, *the more weight we will give* that medical opinion." *Id.* (emphasis added). As for consistency, "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." *Id.* §§ 404.1527(c)(4), 416.927(c)(4). The ALJ did not explain how he considered these two factors when picking the DDS reviewers' proposed "mild limitation" rating over Dr. Gardner's proposed "moderate" limitation rating concentration, persistence, or pace.

46

Second, the ALJ relied on "trivial inconsistencies" in the medical record, *Testamark*, 736 F. App'x at 398–99, to support his conclusion that Dr. Gardner's proposed moderate limitation in concentration, persistence, or pace was "inconsistent with" other providers' observations that Debra was "alert and oriented" on physical exams throughout the relevant time. *See* R. 958–59, 984 (citing R. 703, 708, 716, 738, 759, 772, 785, 1449, 1468, 1546, 1557). The fact that Debra was "alert" just means that she was awake. *Jodie S. v. Kijakazi*, No. 1:22cv4205, 2023 WL 6882416, at *19 (D.S.C. Aug. 24, 2023). "It does not mean she ha[d] no concertation deficits or off-task behavior." *Id.*; *see also TN v. Kijakazi*, No. 20cv4946, 2021 WL 4553581, at *9 (N.D. Cal. Oct. 5, 2021) ("The fact that Plaintiff was alert does not mean that Plaintiff does not have significant cognitive impairments."). Nor does it have anything to do with Dr. Gardener's medical opinion that Debra should be limited to simple and repetitive work tasks based on his assessment that she exhibited only "fair-to-good" judgment and mild-to-moderate degrees of impairment in immediate recall, recent memory, general fund of information, basic computation skills, and abstract thinking ability.

The fact that Debra was "oriented" on exams simply means that she was aware of person, place, time, *or* situation. *See, e.g.*, *Nguyen v. Berryhill*, No. 17cv1406, 2018 WL 4214478, at *3 n.2 (S.D. Cal. Sept. 5, 2018) ("'Oriented x3' means that a person is oriented to person, place, and time, but is not aware of the situation."); *Fernandez v. Comm'r of Soc. Sec.*, No. 8:14cv1272, 2015 WL 4911459, at *6 (M.D. Fla. Aug. 17, 2015) (noting that "oriented x4" means the person is "oriented to person, place, time, and situation"). Indeed, Dr. Gardner also found that Debra was "oriented x4" during his mental-status exam, a finding which he interpreted as an absence of "psychotic symptoms." R. 518 (capitalization altered). Dr. Gardener still concluded that Debra's imperfect performance on cognitive testing meant that she had a "moderately" impaired capacity

to concentrate, persist, or maintain pace when trying to do "simple and repetitive work tasks." R. 518–19; *cf. Hines*, 453 F.3d at 565 (ALJ's "conclusion was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two.").

The facts that Debra was "in no apparent [or acute] distress" and exhibited "clear, spontaneous speech" on two physical exams in 2018–2019 are not relevant to determining the weight Dr. Gardner's medical opinions deserved under the regulations. "To physicians, 'No Acute Distress' means that your patient will probably not become unstable in the next five minutes." *Wanserki v. Colvin*, No. 1:14cv1033, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015) (quotation marks omitted). Debra's speech was clear, spontaneous, and responsive during Dr. Gardner's more detailed psychological exam in May 2016. R. 514. Those normal findings did not impact his opinions about Debra's moderate impairment of memory and concentration, persistence, and pace in the context of "attempting simple and repetitive work tasks." *See* R. 517–19.

Finally, the ALJ did not explain why he found the internist's and pain-management specialist's failure to document "any outward inattentiveness, distractibility, or slowness" on physical exams, R. 984, more persuasive than Dr. Gardner's express finding that Debra took 70 seconds to complete serial threes (with one error) on cognitive-functioning testing designed to measure concentration, persistence, and pace, R. 518. All of these errors warrant reversing the Commissioner's denial of benefits for the period prior to July 10, 2019, and remanding Debra's case for the second time.

**

The ALJ also made other errors. First, he misapplied the governing regulation in concluding that the DDS reviewers' medical opinions "generally are entitled to some weight"

48

simply by virtue of "their specialized expertise and understanding of the Social Security Administration's disability programs" and presumed opportunity to review the claimant's complete medical record at the time of their assessments, R. 982. *See, e.g.*, 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) ("Examining relationship. Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a source who has not examined you."). Those "are relevant factors that [the ALJ] will consider in deciding the weight to give a medical opinion," *id.* §§ 404.1527(c)(6), 416.927(c)(6), but they do not favor giving a nonexamining source's medical opinion more weight than it might otherwise deserve under the supportability and consistency factors, *id.* §§ 404.1527(c)(3)(4), 416.927(c)(3)–(4). *See, e.g.*, *Radford*, 734 F.3d at 295–96 (citing 20 C.F.R. § 404.1527(c)(3)). On the contrary, "because nonexamining sources have no examining or treating relationship with" the claimant, the weight that the ALJ "give[s] their medical opinions *will depend* on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (emphasis added). The ALJ did not adequately explain whether, and if so, how, he considered the supportability factor when giving "significant weight" to Drs. Perrott and Jenkins's medical opinions that Debra had only "mild" difficulties maintaining concentration, persistence, or pace. R. 982. *Cf. Stephen R. v. O'Malley*, No. 21-2292, 2024 WL 3508155, at *4 (4th Cir. July 23, 2024) (concluding that "the ALJ did not correctly apply 20 C.F.R. § 404.1520c to reports by state psychologists, . . . which informed his evaluation of [Stephen's] RFC," where the ALJ "invoked" the supportability and consistency factors in his decision, but "his analysis was threadbare and lacked citations" to any specific evidence in the record) (citing *Patterson*, 846 F.3d at 663). As explained, his articulated reasons for rejecting Dr. Gardener's examining-source medical opinion that Debra would have a "moderate" impairment in that area (when

trying to do simple and repetitive work tasks) are legally flawed and not supported by substantial evidence in Debra's record.

Second, the ALJ did not conduct proper mental RFC assessment after concluding at step two that Debra's mental MDIs were "not severe" insofar as they caused only "mild" limitations in her capacities for understanding, remembering, or applying information and concentrating, persisting, and maintaining pace. That conclusion is flawed for the reasons explained above. Even if it was legally and factually supported, however, the ALJ still needed to conduct "a more detailed [mental RFC] assessment by itemizing various functions" in the paragraph B criteria, SSR 96-8p, 1996 WL 374184, at *4, to fairly determine Debra's "*maximum* remaining ability" to sustain mental work activities for eight hours a day, five days a week, *id.* at *2. *See, e.g.*, *Dolly H.*, 2023 WL 6566603, at *5–8; *Eric E.*, 2022 WL 18213534, at *7.

For example, a mental MDI that is "non-severe" because it causes no more than "mild" limitations in the paragraph B criteria and does not otherwise significantly limit the claimant's ability to do the "basic work activities" commensurate with simple, unskilled work might still reduce the claimant's capacity to sustain the complex and abstract tasks inherent in skilled work. *See, e.g.*, *Eric E.*, 2022 WL 18213534, at *7. The ALJ's failure to conduct this more detailed "function-by-function assessment of the [claimant's] limitations or restrictions could result in the [ALJ] overlooking some . . . limitations or restrictions" that would preclude the claimant from doing her "past relevant work or may narrow the range of other work that [she] may still be able to do." SSR 96-8p, 1996 WL 374184, at *4–5. Indeed, that is exactly what happened in Debra's case. Dr. Gardner's exam report shows that he interpreted Debra's *inability* to complete certain cognitive-function tests as consistent with "mildly-to-moderately impaired" computation skills and "mildly impaired" abstract thinking ability. R. 518. Dr. Gardner also opined that her

"capacity to make sound and reasonable decisions" was only "fair." *Id.* Debra's ability to do any

skilled work would require her to understand the potentially complex "principles and process" of

her trade and exercise judgment to "apply them in practice in a proper and approved manner," R.

940; *accord* 20 C.F.R. §§ 404.1568(c), 416.968(c). Her ability to be a Branch Manager, Loan

Officer, or Loan Interviewer in the commercial banking industry would require her to use high-

level reasoning and math skills. Dr. Gardner's medical opinions identifying "mild-to-moderate"

limitations in these same functional areas are relevant to Debra's ability to sustain skilled work.

The ALJ did not mention them. This was error. *See, e.g.*, *Dolly H.* 2023 WL 6566603, at *5–8;

*Eric E.*, 2022 WL 18213534, at *7; SSR 96-8p, 1996 WL 374184, at *7 ("If the RFC assessment

conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not

adopted.").

Third, the ALJ never explained how he concluded—based on *any* of the evidence he

cited in his decision—that Debra could actually perform the tasks required by "skilled work."

*See, e.g.*, *Eric E.*, 2022 WL 18213534, at *7; *cf. Testamark*, 736 F. App'x at 398–99 (citing

*Patterson*, 846 F.3d at 659). The missing analysis is especially troubling because at the June

2017 hearing Debra testified to specific facts that contradict the ALJ's conclusion that she could

have done skilled work from July 2015 to July 2019. Debra's testimony on this point is

undisputed in the record. *See Hines*, 453 F.3d at 565–66. The ALJ referenced her testimony in

his decision, R. 958–59, 963, 975, and found that Debra's MDIs could reasonably be expected to

cause [her] alleged symptoms during the period at issue," R. 975. He also found that "the alleged

intensity, persistence, and limiting effects of the symptoms [were] not entirely consistent with

the rest of the evidence." R. 978. His actual analysis, however, addresses only his conclusion that

Debra's *physical* symptoms did not prevent her from doing "a range of sedentary work as

described in" his RFC finding. R. 978 (citing R. 962); *see* R. 975–82. The ALJ's RFC analysis simply does not show how or why he concluded that Debra could do sedentary *and skilled* work—including any of three banking occupations that he relied upon to deny Debra's DIB/SSI claims after remand.

Fourth, the ALJ expressly credited Debra's statements as to the nature of her "activities" to support both the "mild limitations" he identified at step two, R. 958–59, and his sedentary RFC finding, R. 978, but seems to have rejected some (but not all) of her statements describing the limited extent to which she actually did those activities. *See* R. 965–67, 978. *Cf. Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities that a claimant can perform without also considering the *extent* to which she can perform them."). For example, in May 2016, Debra told Dr. Gardner, "'I can't vacuum or sweep. I can prepare simple meals or wipe the counters down and dust. I can't carry laundry.'" R. 515. The ALJ cited Debra's ability to "prepare simple meals, wipe counters down, [and] dust," to support his RFC finding, but he left out the household chores she "can't" do. R. 978.

Finally, the ALJ's conclusion that Debra's "activities" (or at least the ones he listed) were "broadly consistent with" and "support[ed]" his RFC finding that Debra could do "a range of sedentary work," R. 978, in a skilled workplace, R. 989, is fundamentally flawed. "For years, [the Fourth Circuit] has bemoaned the tendency of ALJs to overstate claimants' [RFCs] and ability to work based on their daily activities." *Oakes*, 70 F.4th at 216 (cleaned up). "A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities." *Arakas*, 983 F.3d at 101. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons, and is not

held to a minimum standard of performance, as she would be by an employer." *Id.* (cleaned up). Here, for example, the ALJ summarized Debra's June 2017 testimony she had to take multiple 30-to-90 minute rest breaks throughout the day, R. 965 (citing R. 1023–24), but he did not mention it again in his RFC assessment, R. 978. This was error. The ALJ's description of Debra's "simple" activities at step two also conflicts with his conclusion that she could sustain skilled work. While these activities "would require *a basic level* of understanding, remembering, and applying information," R. 958 (emphasis added), and at least "*some* capability" to concentrate, persist, and maintain pace, R. 960 (emphasis added), they do not support the conclusion that Debra could sustain work that requires understanding, remembering, and applying information at a high level of complexity. All of these errors justify reversing the Commissioner's denial of benefits and remanding Debra's case for the second time.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Debra's motion for summary judgment, ECF No. 11, **REVERSE** the Commissioner's final decision denying Debra's DIB and SSI claims, and **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g).

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: September 13, 2024

Joel C. Hoppe
United States Magistrate Judge